UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA ORLANDO DIVISION

Case No. 6:20-cv-2-Orl-40GJK

SHARON GAIL TUCKER, as guardian
of V.C., a minor child,

      Plaintiff,

vs.

EVENFLO COMPANY, INC.,

      Defendant.

_____/

## FIRST AMENDED COMPLAINT

Plaintiff SHARON GAIL TUCKER, as Guardian of V.C., a minor child, sues Defendant

EVENFLO COMPANY, INC., and alleges the following:

### PARTIES, JURISDICTION AND VENUE

1.      This is an action for damages in excess of $75,000.00, exclusive of interest and

costs.

2.      Plaintiff SHARON GAIL TUCKER ("Tucker") is a resident of Lake County,

Florida.

3.      V.C., born in the year 2009, is a minor child and a resident of Lake County, Florida.

4.      Plaintiff Tucker is the Court-appointed Guardian of V.C., a minor child.

5.      Defendant EVENFLO COMPANY, INC., ("Evenflo") was and is a foreign

corporation with its principal address located at 225 Byers Road, Miamisburg, Ohio, and its

registered agent is located at 1200 South Pine Island Road, Plantation, Florida 33324, and it is a

resident of every county in the state of Florida in which it has an agent or representative.

6.     Defendant Evenflo is subject to jurisdiction in the State of Florida under section 48.193, Florida Statutes, because it: (1) operated, conducted, engaged in, or carried on business in Florida; (2) committed a tortious act in Florida; (3) caused injury to persons or property in Florida at or about the time that it was engaged in solicitation or services activities within Florida, at or about the time products or materials it manufactured were used or consumed within Florida in the ordinary course of commerce, trade, or use; or (4) engaged in substantial and not isolated activity within Florida.

7.     Venue is proper under sections 47.021 and 47.051, Florida Statutes and is further predicated upon the fact that Defendant Evenflo is a resident of Orange County and that the majority of the V.C.'s treating physicians with the most knowledge and information pertaining to her injuries practice in and have offices in Orange County, Florida.

## FACTS COMMON TO ALL COUNTS

8.     On or about April 20, 2016, V.C., a minor child, was a passenger in a motor vehicle traveling on Max Hooks Road approaching SR 50 in Groveland, Florida, in a reasonably foreseeable manner, at which time and place a 2005 Chevrolet Impala came into contact with the rear driver's side of the vehicle in which V.C., a minor child, was a passenger.

9.     At the time of the collision, V.C. was seated in an Evenflo Big Kid Booster Seat Child Restraint System, Model Number 31911252A in "Tonal Maze" fabric ("Big Kid"), and she was properly restrained in the Big Kid, in the third row, passenger side seat of her mother's Honda Odyssey.

10.    The purpose of the Big Kid, according to Evenflo, was to restrain a child during a crash.

11.     Defendant Evenflo knew, before V.C.'s Big Kid was sold, that nothing is more important in designing a child restraint system and its usage requirements than to provide safety for a child in the event of a crash.

12.     Defendant Evenflo knew, before V.C.'s Big Kid was sold, that the Big Kid must provide protection to a child in a crash regardless of who causes the crash.

13.     Defendant Evenflo knew, before V.C.'s Big Kid was sold, that child restraint systems must be designed and constructed with the highest levels of safety in mind and that all potential crash scenarios, including side impacts, must be considered in the design process.

14.     V.C.'s Big Kid was manufactured on April 30, 2012 in China and was brought into the United States via direct import, where it was sold to Plaintiff at a "big box" retail outlet.  The owner's manual that came with V.C.'s Big Kid was identified internally at Evenflo as part number 25700616 dated "3/11."

15.     On or before April 20, 2016, the Big Kid manufactured, assembled, designed, tested, marketed, labeled, sold, and/or distributed by Defendant Evenflo was purchased by Plaintiff for V.C.

16.     Upon information and belief, Plaintiff purchased the Big Kid for V.C. at a Walmart retail store in the State of Florida.

17.     The Big Kid was originally intended by Evenflo to "regain control of the (booster seat) marketplace," with the "marketplace" being the $169 million annual revenue derived from booster seat sales in the United States.

18.     Defendant Evenflo deliberately chose to try and regain control of the marketplace, and to then continue that control through sales of the model 319 Big Kid, by knowingly marketing

it for use with children who were too young and too small to be able to obtain adequate protection from crash forces while using it.

19.     Defendant Evenflo's marketing efforts were successful.  By 2008, the Big Kid had become the "reliable workhorse" of revenue and profit generation in Evenflo's line of child restraint systems.

20.      Prior to the sale of the Big Kid to Plaintiff, Defendant Evenflo knew and understood that consumers, including Plaintiff, looked to Evenflo to provide honest, truthful information about the products it was marketing and selling, especially child safety products like the Big Kid.

21.     Defendant Evenflo wanted consumers like Plaintiff to see and rely on the information it provided to them, and it wanted those consumers to put their trust in Evenflo as a company and in Evenflo's child restraints.

22.     Defendant Evenflo wanted consumers to believe that Evenflo was their "partner" in parenting and that Evenflo and its customers shared a common goal of providing safety to children in the event of a crash.  More specifically, Evenflo:

      a.  knew and understood that safety was an important reason why consumers shopped for a child restraint like the Big Kid, and that safety was a "key factor" in the decision-making process;

      b.  knew that consumers looked to Evenflo to tell them about its products;

      c.  wanted consumers to rely on what Evenflo said and promised;

      d.  wanted the information in its marketing materials, including the Big Kid's box and point of sale display, to help consumers make purchasing decisions; and

     e.  wanted the information it supplied to actually influence purchasing decisions being made by consumers.

23.    To capitalize on what it knew about how consumers would respond to what it said, warranted, and promised them, Defendant Evenflo made numerous decisions to appeal directly to consumers' concerns for the safety of their children so that it could sell more child restraints. Among other things, Evenflo made bold and highly conspicuous statements, promises, and warranties on the box in which V.C.'s Big Kid was packaged that:

    a.  the Big Kid embodied a "Safety. So Simple!" design philosophy;

    b.  the Big Kid had been "Side Impact Tested" in both high back and backless modes;

    c.  the Big Kid's side impact testing was done as part of one of the "federal standards," that the Big Kid's side impact testing passed the federal standard and its own internal standard, and that Evenflo had tested the Big Kid to approximately twice the "energy level" used in the federal "standards"; and

    d.  the Big Kid's design was "Best for Baby" – including that it was the "Best" option for children whose age, weight, and height were within the usage requirements for the seat, whether used in high back or backless mode.

24.    Defendant Evenflo used similar tactics to influence purchasing decisions by consumers in the way it actually designed V.C.'s model 319 Big Kid.  More specifically, Evenflo knew, from focus group work it had performed with booster seats, that consumers were concerned about side impact protection.  It knew, from those same focus groups, that consumers believed conspicuous side "wings" on booster seats were design features that would provide real and enhanced protection and restraint to children in side impacts.  It believed that large, conspicuous

armrests would also send the message that the Big Kid, unlike other booster seats that did not have armrests, was designed to provide side impact protection.  Evenflo learned in the focus groups that most caregivers believed "higher arm rests" also made backless boosters "seem more secure and safe" and that "high" armrests provided "added safety."

25.     To take advantage of consumers' heartfelt concerns and desire for side impact protection for their children, and a design feature – side "wings" – that consumers believed provided such protection, Defendant Evenflo, in 2008, began work on the "new back" project for the Big Kid.  The "new back" project, expressly approved by Evenflo's CEO, was driven by Evenflo's marketing department.  The marketing department, with the power of the company's CEO behind it, instructed Evenflo's engineers to redesign the Big Kid's side "wings" so they would be more conspicuous and give the appearance of providing side impact protection.

26.     Defendant Evenflo's engineers did what they were told to do.  They moved the side "wings" of the Big Kid up closer to the head of the Big Kid's "back rest," making them more conspicuous.  They also made the new "wings" feel more solid.  Evenflo insiders, however, knew that the more conspicuous side "wings" did nothing to actually provide side impact protection and, in fact, only created what Evenflo called "perceived" side impact protection.  Finally, Evenflo redesigned the Big Kid's armrests to make them "fixed" in position – rather than adjustable or rotating – and "higher" to send consumers the "more secure and safe" and "added safety" messages.

27.     The redesigned Big Kid side "wings" and arm rests, which provided only the perception of side impact protection, were carefully and deliberately orchestrated marketing tricks.  Shortly after the redesign, in early 2008, Defendant Evenflo learned from its own internal side

6

impact tests that that the new side "wings" did nothing to actually increase side impact protection. More specifically:

    a.   Evenflo began side impact testing of the Big Kid in early 2008;

    b.   between 2008 and 2012, when V.C.'s Big Kid was manufactured, Evenflo ran dozens of side impact tests with the Big Kid with 3, 6 and 10-year-old child dummies, some of which used the "old" back and some of which used the "new" back;

    c.   between 2008 and 2012, when V.C.'s Big Kid was manufactured, Evenflo ran numerous side impact tests with the Big Kid with various sized dummies with the CRS in "backless" mode, some of which used adjustable armrests and some of which used fixed, "higher" armrests;

    d.   in every single side impact test run by Evenflo on the Big Kid with any size dummy, the dummy's head moved violently towards the direction of force at high velocity;

    e.   in every single side impact test run by Evenflo with any size dummy, the dummy's upper torso moved violently towards the direction of force at high velocity;

    f.   in every single side impact test run by Evenflo with any size dummy, the shoulder belt repositioned itself off the shoulder and moved down the arm and mid-torso of the ATD as the dummy moved towards the direction of force;

    g.   in every single side impact test run by Evenflo with any size dummy, the thorax/torso of the dummy struck the armrest with extreme velocity and flexed

over it, many times even changing the position of the armrest – a violation of FMVSS 213 in a 213 test; and

    h.   Evenflo's internal side impact tests established that the Big Kid, with or without the "back" and with or without "higher armrests," performed the same in terms of the amount of lateral excursion and the violence of that excursion.

28.    Defendant Evenflo knew that it was important in a side impact crash to keep both the head and upper torso retained by the lap/shoulder belt and a booster's design features; it knew from its testing that the Big Kid failed to do this in every single side impact test it ever ran.

29.    Defendant Evenflo knew that the loss of head and upper torso restraint in side impact crashes increased the risk of serious injury or death to a child using a Big Kid.

30.    Defendant Evenflo knew that if the Big Kid failed to restrain a child in any kind of crash, even partially, then "it hasn't performed its job."

31.    At the same time it was running the side impact tests referenced above, Defendant Evenflo was also running identical tests with 3 and 6-year-old Anthropomorphic Test Dummies ("ATDs") but with five-point harnessed restraints.  Evenflo learned from such testing that the five-point harness seats did a much better job of keeping the head and upper torso contained within the confines of the child restraint system than the Big Kid did.

32.    Despite what it learned in the testing referenced above, Defendant Evenflo did nothing to redesign the side "wings," armrests, or other parts of the Big Kid to eliminate the "perceived" protection provided by the Big Kid and, instead, provide actual and meaningful protection.

33.    In July 2009, Defendant Evenflo began putting a section in some of its booster seat manuals that was entitled "When to Put Your Child in a Booster Seat."

34.     In July 2009, Defendant Evenflo told some of its customers – but not those who were considering purchasing or using the Big Kid – that they should not even "consider" using a booster seat unless "your child is approaching the weight or height limit of the child restraint they are currently using."

35.     In April 2010 – after two years of running side impact tests with the Big Kid and its five-point harnessed seats and seeing the differences in performance – Evenflo posted, on its Facebook page, a "Best for Baby" list of "child safety facts" to keep children "safe."  Evenflo stated in these "facts" that "car seat safety basics" included "*keep your child in a seat with a harness as long as possible*" and that parents should "*continue to use a seat with a harness as long as the child fits*."

36.     Defendant Evenflo knew that the fundamentals of engineering require that if a hazard cannot be designed out of a product, then it must be guarded against.  And if the hazard cannot be guarded against, then a warning must be supplied.  Evenflo has recognized the validity of this "safety hierarchy" for many years.

37.     Defendant Evenflo knew that, in addition to the design and labeling requirements imposed upon it by the "safety hierarchy," it had an independent obligation to provide consumers with the best information it had on hand to allow them to make good decisions and to enable them to safely use the Big Kid.  Evenflo also knew it had an obligation to share information with consumers that could help them make purchasing decisions.

38.     As of 2011, Defendant Evenflo knew from its own testing that the Big Kid would not "perform its job" in side impacts, that it provided no upper torso or head restraint in side impact, and that head, cervical, and thoracic spinal cord injuries could and would occur in such crashes.

Nevertheless, this information was not shared with consumers and was, instead, actively and deliberately concealed from them.

39.     As of 2011, well over a full year before V.C.'s Big Kid was manufactured, Defendant Evenflo received and studied the March 2011 Policy Statement and Technical Report entitled "Child Passenger Safety" published by the American Academy of Pediatrics ("AAP") in the AAP's highly reputable, peer-reviewed, official journal, "Pediatrics."

40.     The March 2011 issue of Pediatrics expressly and definitively set forth the state of the art in optimal, evidence-based "best practice" recommendations on when to graduate or transition children (i) from rear-facing harnessed seats into forward-facing harnessed seats, (ii) from forward-facing harnessed seats into belt-positioning boosters, and (iii) from belt-positioning boosters into regular automobile seat belts.

41.     In the March 2011 issue of Pediatrics, the AAP stated that its state of the art best practice recommendations were "evidence-based."  Defendant Evenflo knew and understood "evidence-based" to mean that the AAP's statements were based on "papers, peer-reviewed papers and data from out in the research world."

42.     In the March 2011 issue of Pediatrics, the AAP stated – in discussing the transition of children from rear-facing seats, to forward facing seats, to boosters, and then to adult seat belts in cars – that "*it is important to note that every transition is associated with some decrease in protection; therefore, parents should be encouraged to delay these transitions for as long as possible*."

43.     In the March 2011 issue of Pediatrics, the AAP stated that the information set forth in its Policy Statement included "*best practices to optimize safety in passenger vehicles for all children, from birth through adolescence*."

10

44.     In the March 2011 issue of Pediatrics, the AAP stated that "*all children 2 years or older, or those younger who have outgrown the rear-facing weight or height limit for their CSS, should use a forward-facing CSS with a harness for as long as possible, up to the highest weight or height allowed by the manufacturer of their CSS*."  By February 2012 at the latest – just a few months before V.C.'s Big Kid was manufactured – Defendant Evenflo's head child seat safety engineer Eric Dahle agreed with the statement, without exception or disclaimer.

45.     In the March 2011 issue of Pediatrics, the AAP stated that "*there is a safety advantage for young children to remain in CSSs with a harness for as long as possible before transitioning to booster seats*."  By February 2012 at the latest – just a few months before V.C.'s Big Kid was manufactured – Defendant Evenflo's head child seat safety engineer Eric Dahle agreed with the statement, without exception or disclaimer.

46.     The manual that came with V.C.'s Big Kid was approved by Defendant Evenflo's engineers and managers in March 2011 – the same month that the AAP published its state of the art information about booster seat use.  None of what the AAP published found its way into V.C.'s manual.  None of what Evenflo had written in other manuals as early as July 2009 about "When to Put Your Child in a Booster Seat" was included in V.C.'s manual.  None of what Evenflo said back in April 2010 on its Facebook page was put in the manual.

47.     In August 2011, after the AAP's Policy Statement and Technical Report, and after Defendant Evenflo had run dozens of side impact tests on the Big Kid, Evenflo representative Randy Kiser testified in a Big Kid lawsuit, on behalf of Evenflo, that "*the Big Kid is not a restraining device in and of itself.  It is not to provide restraint in side impact*."  Evenflo then stated, through Kiser, that the Big Kid was "*not designed to provide any restraint*."

11

48.     In February 2012 – two full months before V.C.s Big Kid was manufactured – Defendant Evenflo's senior management was told by Eric Dahle that Evenflo should be encouraging parents to leave their children in harnessed seats for as long as possible, "*until he or she reaches the top height or weight limit allowed by (their) car seat's manufacturer*." Mr. Dahle, relying on a published scientific paper that he provided to management, emphasized that "*Early graduation from child restraint seats (CRS) to booster seats may also present safety risks. Child restraint seats may offer more lateral support and better containment for smaller children*." At the time, Mr. Dahle was Evenflo's Associate Director of Engineering for Car Seats. Mr. Dahle also told Evenflo's management that Evenflo should be following "NHTSA guidelines" on booster seat use. The "NHTSA guidelines" referred to by Mr. Dahle included the following:

a.   "To maximize safety, keep your child in the car seat for as long as possible, as long as the child fits within the manufacturer's height and weight requirements"; and

b.   "Keep your child in a forward-facing car seat with a harness and tether until he or she reaches the top height or weight limit allowed by your car seat's manufacturer. Once your child outgrows the forward-facing car seat with a harness, it's time to travel in a booster seat . . .."

49.     For marketing and economic reasons, the express recommendations of Mr. Dahle and others at Evenflo to give parents and consumers the state of the art in child seat recommendations, as published by NHTSA and the AAP, were rejected by Evenflo management. Instead, and in an effort to "keep control of the marketplace" with the Big Kid, Evenflo concealed what it knew from consumers and continued to aggressively promote the Big Kid for use by children as small and young as 3 years old, 38 inches in height, and 30 pounds in weight.

50.     Although V.C.'s Big Kid was not manufactured until April 2012 – almost eight months after Defendant Evenflo's (Kiser's) testimony and two months after Mr. Dahle's recommendations – Evenflo did not alter its marketing or labeling of the Big Kid that Plaintiff would eventually purchase.  Evenflo continued to promise, warrant, and represent to consumers, including Plaintiff, that the Big Kid was a "child restraint."  It continued to promise, warrant, and represent to consumers, including Plaintiff, that the Big Kid would provide "restraint" in side impact crashes.  It continued to promise, warrant, and represent to consumers that the Big Kid was designed to provide "restraint."  And it continued to promise, warrant, and represent that the Big Kid would protect children in crashes.  Each of these promises, warranties, and representations were false and misleading.

51.     In May 2012, after V.C.'s Big Kid was manufactured – but before Evenflo sold the Big Kid to the retailer and before Plaintiff purchased it – Defendant Evenflo modified the manual for the model 319 Big Kid by finally adding the two-page section to the owner's manual entitled "When To Put Your Child In A Booster Seat" that it first included in other booster seat owner's manuals back in July 2009.

52.     In the "When To Put Your Child In A Booster Seat" section, Defendant Evenflo told consumers, among other things, that "you should consider using a booster seat if . . . your child is approaching the weight or height limit of the child restraint they are currently using." Evenflo believed this, as well as the other information in this section, was important information. Evenflo considered the information helpful to parents, particularly on the question of when to transition to a booster seat.  Evenflo knew this information had a bearing on safety.  However, the information was not conveyed to Plaintiff, even though Evenflo had ample opportunity to put the information on or in the box containing the Big Kid that Plaintiff would eventually purchase.  This

13

information was concealed so that Evenflo could continue to maximize market share, revenue, and profit on the model 319 Bid Kid.

53.     None of the information, recommendations, statements, or best practices referenced above, whether from the May 2012 model 319 Big Kid owner's manual, the 2011 AAP Policy and/or Technical Statements, the April 2010 Facebook page, or the express written recommendations (February 2012) of Mr. Dahle, were provided to Plaintiff by Defendant Evenflo when she purchased the Big Kid for V.C.  Nor was any such information provided to Plaintiff after the sale of V.C.'s Big Kid but before the crash.

54.     Notwithstanding what Defendant Evenflo learned through its side impact testing of the Big Kid, it made no effort at all to redesign the side wings or armrests of the Big Kid to reduce the hazards associated with side impacts.  Having failed to make design changes, it then failed to provide warnings to consumers about the inability of the Big Kid to provide any side impact protection beyond that provided by a lap/shoulder belt alone.

55.     Rather than change its defectively designed side wings and armrests to eliminate the "perception" of side impact protection and provide real protection, or to provide necessary and state of the art warnings, Defendant Evenflo promoted the Big Kid Model 319 as a "child restraint" (i) that was specifically intended to provide side impact protection and (ii) that had successfully passed side impact tests required both by Evenflo and the federal government.  Given what Evenflo learned in its side impact testing and what Evenflo (Kiser) had admitted in 2011, as well as the fact that there was not and never had been a federal standard defining side impact testing protocols for booster seats like the Big Kid, these promotional and marketing statements were outrageously false and fraudulent.

56.     During the collision, although V.C. was of a proper weight, height, and age to use the Big Kid according to Evenflo's design requirements, deficiencies in the design, marketing, and labeling of the Big Kid resulted in catastrophic injuries that left V.C. with a permanent spinal cord injury and paralysis.

57.     Because the crash was a side impact to the driver's side of the vehicle, V.C. moved to her left.  Precisely as had been vividly revealed in the side impact tests that Evenflo had been running for years, her Big Kid failed to restrain her, her shoulder belt repositioned down her right arm, and her head and torso violently flexed to the left, causing a severe and permanent thoracic spinal cord injury that left her permanently paralyzed.

58.     V.C. was moved into her Big Kid by Plaintiff at a time when V.C. still easily fit in the five-point harnessed seat she was then using.  At the time of the crash, V.C. would still have fit in the five-point seat she had used before the Big Kid.  Had she still been in her five-point harnessed seat at the time of the crash, she would not have received any permanent injuries in the subject crash.

## EVENFLO COMPANY, INC. IS LIABLE FOR THE FOLLOWING DAMAGES

59.     As a direct and proximate result of injuries sustained by V.C. and her complete total disability, Plaintiff, TUCKER, Guardian of V.C., a minor child, seeks the following past and future damages:

    a.   Past, present and future medical expenses and care;

    b.   Loss of capacity to enjoy life;

    c.   Loss of future earning capacity;

    d.   Mental pain and anguish;

    e.   Bodily injury; and

f.   Disability.

## COUNT I
## NEGLIGENCE AGAINST EVENFLO COMPANY, INC.

60.    Plaintiff restates and realleges paragraphs 1 through 59, as if fully restated herein, and further alleges.

61.    That on or before April 20, 2016, the Big Kid was manufactured by Defendant Evenflo and displayed for sale in retail stores in the State of Florida.

62.    That on or before April 20, 2016, the Big Kid manufactured, assembled, designed, tested, marketed, labeled, sold, and/or distributed by Defendant Evenflo was purchased for use by Plaintiff for V.C.

63.    That the negligence, carelessness, and recklessness of Defendant Evenflo consisted of:

a.   negligently and carelessly designing, researching, developing, manufacturing, labeling, testing, inspecting, maintaining, marketing, distributing, and selling the Big Kid;

b.   negligently and carelessly failing to properly inspect and test the car seat prior to its sale and distribution;

c.   negligently and carelessly assembling, packaging, and/or labeling the product;

d.   negligently packing and shipping the product;

e.   negligently and carelessly selling and distributing the product when it was defective, unsafe, and unsound;

f.   failing to warn Plaintiff and others of the substantial risk of damage created by its product;

g.   failing to remove the product from the market or recall same;

h.   mislabeling the product; and

      i.   otherwise being careless, reckless, and negligent.

64.    That Defendant Evenflo also failed to properly test, design, research, develop, manufacture, market, package, and label its product and Defendant Evenflo, in the exercise of reasonable care, knew or should have known of the unsafe and hazardous condition of its product.

65.    That as a direct and proximate cause of Defendant Evenflo's negligence, carelessness, and recklessness, V.C. sustained serious and permanent personal injuries, for which Plaintiff Tucker, Guardian of V.C., a minor child, seeks damages as set forth in paragraphs 59.

WHEREFORE, Plaintiff, SHARON GAIL TUCKER, as Guardian of V.C., a minor child, demands judgment against the Defendant, EVENFLO COMPANY, INC., for damages exceeding $75,000.00, exclusive of interest and costs, and further demands trial by jury on all issues so triable.

## COUNT II
## STRICT LIABILITY AGAINST EVENFLO COMPANY INC.

66.    Plaintiff restates and realleges paragraphs 1 through 59, as if fully restated herein, and further alleges.

67.    That Defendant Evenflo was and is engaged in the business of selling children's booster car seats.

68.    That Defendant Evenflo designed, developed, tested, manufactured, marketed, and/or distributed, sold, and placed into the stream of commerce the Big Kid.

69.    The Big Kid was unreasonably dangerous and defective because:

    a.   the Big Kid was defectively designed and/or manufactured, causing V.C., a minor, to be paralyzed;

    b.   the Big Kid is unreasonably dangerous because the risks of the design of the booster seat outweigh the benefits of its design and because it does not meet the expectations of Florida consumers;

17

c. the Big Kid does not provide crash protection under reasonably foreseeable conditions;

d. the product does not incorporate a five-point harness and deep side wings;

e. the failure of the Big Kid and Evenflo to adequately warn foreseeable end-users, including the Plaintiff, of the unreasonably dangerous and defective conditions of its product;

f. the failure of the Big Kid and Evenflo to adequately warn foreseeable end-users, including the Plaintiff, of the unreasonably dangerous risks of using its product instead of an alternative that incorporates a five-point harness;

g. the Big Kid was marketed as safe for children who are too small;

h. the Big Kid did not meet or exceed internal standards; and

i. the Big Kid did not meet or exceed industry standards.

70. The unreasonably dangerous defects were present in the Big Kid when it was placed into the stream of commerce by Defendant Evenflo, and the product did not undergo material change or alteration up to and including the time V.C. suffered her injuries.

71. As a direct and proximate cause of Defendant Evenflo's defective and unreasonably dangerous product, V.C. sustained serious and permanent personal injuries, for which Plaintiff Tucker, Guardian of V.C., a minor child, seeks damages as set forth in paragraphs 59.

WHEREFORE, Plaintiff, SHARON GAIL TUCKER, as Guardian of V.C., a minor child, demands judgment against the Defendant, EVENFLO COMPANY, INC., for damages exceeding $75,000.00, exclusive of interest and costs, and further demands trial by jury on all issues so triable.

**COUNT III**
**FRAUDULENT MISREPRESENTATION AS TO EVENFLO COMPANY, INC.**

72.     Plaintiff restates and realleges paragraphs 1 through 59 and 67 through 71, as if fully restated herein and further alleges.

73.     That Defendant Evenflo promoted itself to Plaintiff and the public as a trusted partner to parents in the child safety arena, specifically in child seats, coining catch phrases like "Best For Baby" and "Safety. So Simple!" in an effort to convince parents that it had their best interests at heart.

74.     That Defendant Evenflo (i) counted on parents to rely on its name and catch phrases, (ii) intended and expected that parents would rely on this information, and (iii) is not critical of parents who did rely on this information in making purchasing decisions relating to child restraints.

75.     That Defendant Evenflo knows and understands that safety is one of the key factors in decision making for many parents and caregivers who are looking to purchase a child restraint.

76.     That Defendant Evenflo falsely represented to Plaintiff, the minor's mother, and the public through statements on the Big Kid box and in its marketing materials, labeling, and owner's manual that the Big Kid was safe for use with children as young as 3 years old and as little as 30 pounds in weight and 38 inches in height – i.e., children who were too young and too small to be able to obtain adequate protection from crash forces while using the Big Kid.

77.     That Defendant Evenflo knew that its representations that the Big Kid was safe for use with children as young as 3 years old and as small as 38 inches in height and 30 pounds in weight was false, given its knowledge of the information, recommendations, statements, and best practices referenced above, including but not limited to Evenflo's internal testing showing the

differences in performance between the Big Kid and five-point harnessed seats, the May 2012 model 319 Big Kid manual, the 2011 AAP Policy and Technical Statements, Evenflo's April 2010 Facebook post, the 2011 NHTSA recommendations, and the express written recommendations of Mr. Dahle in February 2012.

78.     That Defendant Evenflo falsely represented to Plaintiff, the minor's mother, and the public through statements on the Big Kid box, as well as in the marketing materials, labeling, and owner's manual, that the Big Kid was a "child restraint" and that it would provide safety in a side impact.

79.     That in truth and fact, however, Defendant Evenflo knew the Big Kid was not a "child restraint" – which it admitted through Randy Kiser's testimony in August 2011 – and, based on its internal side impact testing, Evenflo knew that the Big Kid offered **zero restraint for children in side impact collisions**.

80.     That Defendant Evenflo knew at the time it made its fraudulent misrepresentations regarding the safety, risks, dangers, and warnings of the Big Kid that its misrepresentations were false and misleading.

81.     That Defendant Evenflo made its fraudulent misrepresentations intentionally, willfully, wantonly, and with reckless disregard and depraved indifference for the safety and well-being of the users of their product, such as Plaintiff and V.C., a minor.

82.     That Defendant Evenflo intended for the public, including Plaintiff, to read and rely upon its statements on the Big Kid's box, manual, marketing materials, and labeling and thereby be induced to purchase the product.

83.     That when Plaintiff purchased the Big Kid for use with V.C., as well as at all times while V.C. was using the Big Kid up to and including at the time of the wreck on April 20, 2016,

Plaintiff justifiably relied on Defendant Evenflo's fraudulent misrepresentations concerning the safety, risks, warnings, and dangers of the Big Kid – including but not limited to Evenflo's false representations about: (i) the "safety" of the Big Kid for children, including V.C., who were too young and/or too small to be able to obtain adequate protection from crash forces while using it; and (ii) the purported protection that the Big Kid would provide in side impact collisions for children, like V.C., who according to Evenflo were of an appropriate age and size for proper use of the seat (3 years old, 38 inches, and 30 pounds) .

84.    That as a direct and proximate result of Defendant's fraudulent misrepresentations, which Plaintiff acted in reliance on in purchasing the Big Kid for V.C. and then using it with V.C., V.C. sustained serious and permanent personal injuries, for which Plaintiff Tucker, Guardian of V.C., a minor child, seeks damages as set forth in paragraph 59.

WHEREFORE, Plaintiff, SHARON GAIL TUCKER, as Guardian of V.C., a minor child, demands judgment against the Defendant, EVENFLO COMPANY, INC., for damages exceeding $75,000.00, exclusive of interest and costs, and further demands trial by jury on all issues so triable.

## COUNT IV
## FRAUDULENT CONCEALMENT AS TO EVENFLO COMPANY, INC

85.    Plaintiff restates and realleges paragraphs 1 through 59 and 67 through 84, as if fully restated herein, and further alleges.

86.    That Defendant Evenflo misrepresented material facts and suppressed the truth concerning the safety, risks, dangers, and warnings of the Big Kid.

87.    That Defendant Evenflo falsely represented to Plaintiff, the minor's mother, and the public through statements on the Big Kid box and in its marketing materials, labeling, and owner's

manual that the Big Kid was safe for use with children as young as 3 years old and as little as 30 pounds in weight and 38 inches in height – i.e., children who were too young and too small to be able to obtain adequate protection from crash forces while using the Big Kid.

88.     That Defendant Evenflo suppressed the truth regarding the "safety" of the Big Kid for children, like V.C., who were too young and/or too small to safely use the Big Kid and were of an age and size that allowed them to be safely and comfortably accommodated by a forward-facing child restraint system with a five-point harness.

89.     Among other things, Evenflo intentionally, knowingly, and purposefully concealed from Plaintiff, the minor's mother, and the public the information, recommendations, statements, and best practices concerning the appropriate time to transition a child, like V.C., from a forward-facing seat with a five-point harness to a belt-positioning booster seat, like the Big Kid – i.e., that (i) the transition to a booster from a forward-facing seat is associated with some decrease in protection; (ii) there is a safety advantage for young children to remain in child restraint systems with a five-point harness for as long as possible, up to the highest weight or height allowed by the manufacturer of their seat; (iii) parents should be encouraged to delay the transition from a five-point harnessed seat to a booster seat; and (iv) early graduation/transition from a five-point harnessed seat to a booster seat may also present safety risks, as child restraints with a five-point harness may offer more lateral support and better containment for smaller children.

90.     That Defendant Evenflo fraudulently concealed, and/or intentionally omitted, from its advertising, marketing, labeling, and owner's manual that the Big Kid provided zero restraint in side-impact collisions.

91.     That Defendant Evenflo fraudulently concealed, and/or intentionally omitted, from its advertising, marketing, labeling, and owner's manual the fact that Evenflo was aware from its own internal side-impact testing that the Big Kid provided zero restraint in side-impact collisions.

92.     That Defendant Evenflo fraudulently concealed and suppressed the truth with respect to its representations in marketing materials for the Big Kid, on the Big Kid packaging carton, and on the booster seat itself that the Big Kid was "Side Impact Tested."  Evenflo knew that such representations were false and highly misleading, given that:

  a.   in every single side impact test run by Evenflo on the Big Kid with any size dummy, the dummy's head moved violently towards the direction of force at high velocity;

  b.   in every single side impact test run by Evenflo with any size dummy, the dummy's upper torso moved violently towards the direction of force at high velocity;

  c.   in every single side impact test run by Evenflo with any size dummy, the shoulder belt repositioned itself off the shoulder and moved down the arm and mid-torso of the ATD as the dummy moved towards the direction of force;

  d.   in every single side impact test run by Evenflo with any size dummy, the thorax/torso of the dummy struck the armrest with extreme velocity and flexed over it, many times even changing the position of the armrest – a violation of FMVSS 213 in a 213 test; and

  e.   Evenflo's internal side impact tests established that the Big Kid, with or without the "back" and with or without "higher armrests," performed the same in terms of the amount of lateral excursion and the violence of that excursion.

93.     That Defendant Evenflo knew, or should have known under the circumstances, that its representations were false and that it was suppressing the truth of material facts concerning the safety, risks, dangers, and warnings of the Big Kid.

94.     That Defendant Evenflo's misrepresentations, concealment, and omissions of material facts concerning, *inter alia*, the safety, risks, dangers, and warnings of the Big Kid, were made purposefully, willfully, wantonly, and/or recklessly to mislead Plaintiff, the minor's mother, and the public and Evenflo did so with the intention to induce consumers, including Plaintiff, to purchase the Big Kid for their child.

95.     That, in purchasing the Big Kid for V.C. and then using it with her, Plaintiff and the minor's mother justifiably relied on Evenflo's misrepresentations of material facts concerning, *inter alia*, the safety, risks, dangers, and warnings of the Big Kid, which fraudulently and/or purposefully did not include material facts that were concealed, suppressed, and/or omitted by Defendant Evenflo.

96.     That as a direct and proximate result of Plaintiff's justifiable reliance on Defendant Evenflo's fraudulent concealment, V.C. sustained serious and permanent personal injuries, for which Plaintiff Tucker, Guardian of V.C., a minor child, seeks damages as set forth in paragraph 59.

WHEREFORE, Plaintiff, SHARON GAIL TUCKER, as Guardian of V.C., a minor child, demands judgment against the Defendant, EVENFLO COMPANY, INC., for damages exceeding $75,000.00, exclusive of interest and costs, and further demands trial by jury on all issues so triable.

DATED this 30th day of January, 2020.

/ s / Carter W. Scott
Carter W. Scott
Florida Bar No.: 111757
Attorney E-Mail:  cws@searcylaw.com
Primary E-Mail: _Scottteam@searcylaw.com
James W. Gustafson, Jr.
Florida Bar No.:  0008664
Attorney E-Mail:  jwg@searcylaw.com
Primary E-Mail:  _Gustafsonteam@searcylaw.com
Searcy Denney Scarola Barnhart & Shipley, P.A.
517 North Calhoun Street
Tallahassee, Florida 32301
Phone: (850) 224-7600
Fax:     (561) 383-9516
Counsel for Plaintiff